Estate of William C. Atwater by William C. Atwater, Jr., John J. Atwater, Margaret Atwater Olds, and David H. Atwater, Executors, v. Commissioner. The Chase National Bank of the City of New York v. Commissioner.
Estate of Atwater v. Commissioner
Docket Nos. 2616, 2617.
United States Tax Court
1944 Tax Ct. Memo LEXIS 40; 3 T.C.M. (CCH) 1223; T.C.M. (RIA) 44375; November 21, 1944
*40 Charles B. McInnis, Esq., 735 Transportation Bldg., Washington, D.C., Ernest M. Callomon, Esq., and Philip S. Jessup, Esq., for the petitioners. F. S. Gettle, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: These proceedings, consolidated for hearing, are for the redetermination in Docket No. 2616 of a deficiency in estate tax claimed to be due from the estate of William C. Atwater in the amount of $223,362.27 and in Docket No. 2617 of the liability of the petitioner for the estate tax deficiency under section 811 of the Internal Revenue Code. The questions in issue in Docket No. 2616 are whether there should be included in the gross estate of the decedent as transfers made in contemplation of death (1) a gift in 1928 of Wheeling & Lake Erie Ry. Co. stock to decedent's wife; (2) assets transferred to the Chase National Bank under the terms of an indenture of trust executed by the decedent on February 9, 1931; (3) a gift of two parcels of real estate by the decedent to his four children on October 22, 1936; (4) the assets of a trust created by the decedent on November 27, 1936, for the benefit of his daughter-in-law, Eleanor Bartlett Atwater; *41 also alternative issues relating to the valuation at the date of decedent's death of the Wheeling & Lake Erie Ry. Co. stock, 7,500 shares of stock of William C. Atwater & Co., Inc. of New York, and $44,000 principal amount of West Bay Co. notes. A further issue is whether the estate is entitled to a credit against the Federal estate tax deficiency of State inheritance taxes which may be due from the estate. The issue in Docket No. 2617 is whether the Chase National Bank of the City of New York is liable as transferee for any tax asserted against the estate. Findings of Fact The petitioners in Docket No. 2616 are the only children of William C. Atwater who died testate a resident of Florida on February 22, 1940. As executors they filed an estate tax return for the estate of the decedent with the collector of internal revenue at Jacksonville, Florida. The decedent left surviving him his wife, Ida W. Atwater, his four children, ranging in age from 41 to 50 years, and 12 grandchildren ranging in age from 2 to 24 years. The decedent was born July 4, 1861. He was graduated from Amherst College in 1884. Soon thereafter he entered the retail coal business at Fall River, Mass. In 1889 *42 he incorporated this business under the laws of Massachusetts as William C. Atwater & Co., Inc. The business prospered greatly. The decedent became interested in the wholesale coal business as well as with the retail. In about 1900 he moved to New York City in order to obtain a larger field for his operations. He soon organized under New York law William C. Atwater & Co., Inc., which was entirely independent of the Massachusetts corporation. This new corporation acted as sales agent for a number of coal mines in the Pocahontas Field of West Virginia. It organized or acquired control of a number of coal mining companies, among which were American Coal Co., Mill Creek Coal & Coke Co., and Elkhorn Coal Co. For many years prior to 1928 the decedent was president not only of the above-named Massachusetts corporation, but also of the New York corporation and the above-named coal mining companies. The decedent led an extremely active life from the time that he first entered business to about 1934. The coal business was good during most of the time until about 1922. It was particularly prosperous during the World War period when bituminous coal sold as high as $20 a ton at the mine. This *43 high price for coal brought many mines into production and within a few years after the end of the World War the supply greatly exceeded the demand and a depression came upon the industry. Many mines had to cease production. The mines with which the decedent was identified were mostly low-cost producers and they continued to operate. From 1922 to about 1934 the decedent was extremely active in trying to stabilize the coal industry. He was the principal figure in the Pocahontas Producers Association and labored strenuously to effect some kind of a merger between the companies which would enable them to market their coal at a profit. As soon as the decedent's sons became of an age to enter upon business careers they were given employment with different enterprises controlled by the decedent. It was the decedent's plan to train them eventually to assume his responsibilities and carry on when he was no longer able to do so. The decedent had found time during his business career to take some vacations. He traveled throughout the United States and made a number of trips to Europe. He also traveled to the heart of Africa and went around the world. In 1927 he had an extended European trip *44 which took him to the North Cape and the northern countries of Europe. The last time he left the continental United States was on a trip to Honolulu in the fall of 1931. He went by boat from New York through the Panama Canal to Honolulu, back to San Francisco, and home by train. He was accompanied on this trip by his wife and daughter. In 1905 or prior thereto the decedent purchased a 10-acre tract bordering on the ocean at Westhampton Beach, Long Island. In 1905 he constructed a large house upon it which he occupied as a summer home for many years. He took great delight in developing, improving and landscaping the property. He also acquired in 1923 another parcel of property known as Duneland Havens which had an ocean frontage of about 1900 feet and which was several miles from Westhampton Beach and opposite the town of East Moriches. The decedent made a number of trips to Florida in the winter time. His wife, who suffered from rheumatism, liked the Florida climate. In 1934 the decedent purchased a home in St. Petersburg. Title was taken in the name of decedent's wife and she furnished the money for the purchase of it. Shortly thereafter two adjoining lots were purchased and the *45 house on one was removed to a vacant lot. Since the Florida climate appealed to the decedent's wife, he spent more time there than he had in previous years and his wife protested coming north for short vacations in the summer. They did, however, come to the Westhampton home during each of the summers from 1936 to 1939, inclusive, although they did not spend their entire summers there. The decedent had few physical ailments during his lifetime. He had a typhoid infection about 1901 and a nervous reaction from overwork in 1909 as a result of which he was ordered to take a rest in a sanitorium in New Jersey. He spent one night there and then left for Europe where he completely recovered. The decedent applied for life insurance when he was a young man of only about 25. His application was rejected because of a heart murmur. The knowledge that he had a heart murmur made the decedent careful of his health all of his life. He did not indulge in violent physical exercise and refrained even from playing golf. He had many check-ups by different doctors in the later years of his life for the purpose of ascertaining his bodily condition. In 1928 he consulted Dr. William H. W. Knipe, a practicing *46 physician in New York City, four or five times during the year. He complained of some chest pains. The doctor found nothing wrong with his heart, however, and assured him that he was in good physical condition. During 1929, decedent consulted Dr. Clarence William Lieb, of New York City, who advised him that his "organic status, judged by the various tests which we have made and my clinical check up, is excellent." Decedent next consulted Dr. W. G. Post, Jr., of St. Petersburg, Florida, on February 5, 1931. The decedent complained of chest and abdominal pains. Dr. Post did not see the decedent again until March 3, 1931. He saw him several times thereafter during that month. He diagnosed decedent's condition as nervousness and gave him treatment to which the patient responded. Decedent did not see the doctor again until January, 1934. He treated him several times during January, February, and March of that year. He did not notice any symptoms of a Parkinsonian condition in 1931 but did observe such symptoms in 1934. He continued to treat the decedent from time to time thereafter until his death in 1940. He took an electrocardiogram of the decedent on February 2, 1936, and found his *47 heart condition to be normal. During the period September 28, 1931, to January 3, 1936, the decedent was treated from time to time by Dr. A. S. Blumgarten, of New York City. Dr. Blumgarten first examined him on September 28, 1931, and found that he was in very good physical condition, with the exception of a systolic murmur of the heart. This murmur did not affect his general health or physical well-being Dr. Blumgarten made other examinations during the period September 28, 1931, to January 3, 1936, and found that with the exception of a hernia which began to trouble the decedent during the latter part of the period and tremors of his hands which began about 1934, the decedent was in good physical condition. Several electrocardiograms were made during this period, the last one being made in 1936. These electrocardiograms indicated that the decedent was in normal health for a man of his age. The doctor so advised him. He always found the decedent to be cheerful, interested in life, and anxious to discuss his travels. On May 19, 1936, the decedent consulted Dr. Walter Gray Crump, an eminent surgeon of New York City, for opinion as to whether he should undergo an operation for double *48 hernia. Dr. Crump gave him a physical examination and found that except for the hernia he was in good health. The decedent was anxious to have the hernia condition corrected since it interfered with his playing shuffleboard at St. Petersburg, Florida. Dr. Crump operated on him on June 26, 1936, for his hernia and saw him from time to time thereafter until September 29, 1936. The decedent made a good operative recovery. Dr. Crump observed the Parkinsonian condition, referred to above, but did not think it severe enough to interfere with the operation. After his recovery from the operation he advised him that he could "do anything he felt like doing in a general physical way." In July, 1936, the decedent consulted Dr. Donald R. Keller, for a general check-up. Dr. Keller found that he was in good physical condition for a man of his age. He examined the decedent from time to time thereafter until 1939. The decedent's physical condition continued to be good until the hurricane which struck Westhampton Beach on September 21, 1938, when the decedent was at his summer home. The hurricane was especially severe at Westhampton and the doctor began to notice a decline in decedent's physical *49 condition from the time of the hurricane. After returning to Florida in the fall of 1939 the decedent's heart condition became bad. He was removed to a hospital in the early part of 1940 and about 10 days before his death on February 22, 1940, contracted terminal pneumonia. Dr. Post was the attending physician at his death and on the death certificate gave as the immediate cause of death "Generalized arteriosclerosis - 12 years?" For some time prior to September 12, 1928, the decedent was associated with Frank E. Taplin, a coal operator of Ohio, in several speculative enterprises. He came to the conclusion that his entire fortune was in danger from such enterprises. He had acquired 28,500 shares of common stock and 500 shares of preferred stock of Wheeling & Lake Erie Ry. Co. in one of his speculative investments. He decided to make a gift of these shares to his wife in order that they might not be lost in his transactions with Taplin. Accordingly, on September 12, 1928, he caused the certificates for these shares to be transferred to the name of his wife and made a gift of them to her. Thereafter she reported the income from these shares on her own income tax returns up to February *50 9, 1931, when she created a trust in respect of them, as shown below. The respondent has held that the gift of these shares to his wife was a gift made by the decedent in contemplation of death and has included in the decedent's gross estate the shares at a value of $310,731.25. The coal industry was greatly depressed for several years beginning with 1929. The shares of stock of coal mining companies as well as those of other industrial companies felt the depression severely. William C. Atwater & Co., Inc., of New York, had been borrowing large amounts of money from the Chase National Bank for the purpose of financing shipments of coal in the summertime from the Pocahontas Field to Great Lake ports. In some years as much as $700,000 was borrowed for this purpose. The decedent was fearful that the Chase National Bank might refuse loans upon the general credit of the company. He therefore conceived the idea of creating a trust with the Chase National Bank of his 7,500 shares out of 13,900 shares outstanding of the above-named New York corporation, which also controlled through ownership of shares a number of coal mining companies. In February, 1930, the decedent requested his eldest *51 son, William C. Atwater, Jr., to contact the trust officer of the Chase National Bank with respect to creating a trust with that bank. The decedent informed his son that he thought it would be an excellent idea for the Chase National Bank to own as trustee a controlling interest in his corporation. He thought that the bank could give the company and his sons excellent advice with respect to enterprises with which he was identified and that the bank would be less likely to refuse to make loans to his corporation or less likely to call loans which had been made. He also informed the son that it was his intention to shift to his sons a part of his responsibilities for his enterprises so that he might have more time to travel and enjoy life. The son contacted Mr. Farr, a trust officer of the Chase National Bank, and many months went by before a trust instrument was drawn up. The trust instrument was finally perfected in January, 1931. It had not been whipped completely into shape until after the decedent had left for Florida for a vacation. While the decedent and his son were discussing the creation of this trust the decedent's wife also suggested to her son that she would like to create *52 a trust with respect to her shares of stock in the Wheeling & Lake Erie Ry. Co. She said that if her husband, the decedent, was to give her the life income of the trust which he was to set up she would like to give the decedent the life income on the shares of railway stock which belonged to her. The son found that the Chase National Bank would be glad to act as trustee of the trust to be created by his mother as well as that of the trust to be created by his father. Accordingly, trust instruments were drawn up in almost identical terms for the decedent and his wife, the income of the trust to be set up by the decedent to belong to his wife and the income of the trust set up by the wife to belong to the decedent. As soon as the trust instruments were perfected they were sent by mail to the decedent and his wife at St. Petersburg, Florida, and executed by them on the same day, February 9, 1931, and the securities forming the corpus of each trust were delivered to the Chase National Bank as trustee. The corpus of the trust set up by the decedent on February 9, 1931, consisted of the following: 7,500 shares of common stock in William C. Atwater & Co., Inc., of New York. 237 shares *53 of common stock in William C. Atwater & Co., Inc., of Mass.
150 shares of common stock in Ennis Coal Co. 1,124 shares of common stock in Chase National Bank of the City of New York. $44,000 aggregate principal amount of West Bay Co. not-s. Upon the death of each life tenant the assets of each trust were to belong to the grantor's children and their descendants. The trusts were irrevocable. The grantor did not retain any right to amend the trusts and retained no control over the trustee. Each instrument provided, however, that sales, changes in investments, and voting of stock held by each trust should be made only at the direction of decedent's three sons. In the determination of the deficiency the respondent determined that the trust created by the decedent on February 9, 1931, was created in contemplation of death and that the value of the trust assets at the date of death was includable in the gross estate. He determined such value to be as follows: 7,500 shares William C. Atwater & Co.
(N. Y.) at $47.83 per share
$358,725.00
237 shares common stock William C.
Atwater & Co., Inc. (Mass.) at $33.17
per share
7,851.81
1,124 shares Chase National Bank of
New York at $36 per share
40,464.00
50 shares The Texas Co. at 44 3/8 per
share
2,218.75
112 shares The Amerex Holding Cor-
poration at 15 1/2 per share
1,736.00
$44,000 principal amount of unsecured
notes of the West Bay Company
44,000.00
Total
$454,995.56
*54 The fair market value of the above stated assets of the trust created by the decedent on February 9, 1931, was at date of death, February 22, 1940, as determined by the respondent, except as to the value of the unsecured notes of the West Bay Co. The fair market value of those notes at the basic date was $22,000. On October 22, 1936, the decedent transferred by deed to his four children two parcels of real estate located on Long Island. One of these parcels consisted of the 10-acre country estate at Westhampton Beach on which the decedent had constructed a large summer home and the other parcel consisted of unimproved dune lands several miles away, opposite the town of East Moriches, with a 1900 foot frontage on the ocean. Decedent had purchased a home in his wife's name in St. Petersburg, Florida, in April, 1934, and had become very much interested in developing it. After he purchased the Florida property he began to lose interest in his Westhampton Beach property. Decedent had spent part of the summer of 1936 at his Westhampton Beach estate and in the early part of October, 1936, he had an unfortunate experience with the caretaker of many years' standing. The decedent became *55 very much disgusted when he found the caretaker drunk. He thereupon told his son that he was going to give the place to his children. He directed his son to have deeds prepared transferring all of his real estate on Long Island to his four children equally. Deeds were drawn up transferring the property which the decedent signed on October 22, 1936. In delivering the deeds to his four children the decedent stated: "You have got to go ahead and run this. I have had enough. It has served its purpose so far as I am concerned. I have my Florida home. You can do anything you want with it." Thereafter the decedent's children managed and bore the expense of caring for the Westhampton property. They occupied the house at Westhampton Beach a part of the time but were glad to have their father and mother come there for their summer vacations. They did come there and spent a part of each summer of 1937, 1938, and 1939. The respondent has determined that the gift of this real estate was made in contemplation of death and that the value of the property at date of death is includible in the gross estate. The fair market value at date of death of the two parcels of property was $52,000. During *56 the month of December, 1935, the decedent's daughter, Margaret Atwater Olds, suggested to her father that he create a trust for her sister-in-law, Eleanor Bartlett Atwater. She was the mother of five small children and, unlike the decedent's daughter and her two other sisters-in-law, had inherited no property from her parents. The decedent agreed that this would be a nice thing to do. He was very fond of Eleanor. He requested his son, William C. Atwater, Jr., to have a trust instrument drawn for Eleanor. It was not, however, until November 27, 1936, that the trust instrument was drawn and executed by the decedent. The corpus of the trust consisted of securities of a value of about $17,000. The respondent has included the value of these securities at the date of death of the decedent in the gross estate at a value of $17,062.50. This inclusion was upon the theory that the trust was created in contemplation of death. After the decedent transferred to the Chase National Bank as trustee assets to form the corpus of the trust of February 9, 1931, he still owned property of a value of approximately $144,000. Soon thereafter he turned over the presidency of a number of his companies to his *57 sons and became chairman of the board of directors of each. His income from salaries for the years 1932 to 1939, inclusive, ranged from $21,275 in 1932 to $16,000 in 1939. In addition to this income he also received income from securities owned by him and the income from the trust which was set up by his wife on February 9, 1931. This income was ample for his needs. The transfers of shares of stock made by the decedent as a gift to his wife on September 12, 1928, and of land to his children on October 22, 1936, and of property to the trustees for the creation of the trusts of February 9, 1931, and of November 27, 1936, were not made in contemplation of death. Opinion The principal question presented by these proceedings is whether the transfers which are here in question were made in "contemplation of death" within the meaning of section 811 (c), Internal Revenue Code, which provides for the inclusion in the gross estate of a decedent of all property transferred "in contemplation of or intended to take effect in possession or enjoyment at or after his death." It is the contention of the respondent that by 1928 the decedent was physically on the decline; that he had reached a point *58 in his life where he desired to be relieved of the burdens of his corporate activities; that he "thereupon evolved a comprehensive plan embracing the disposition of his entire estate, whereby he systematically disposed of nearly his entire estate over the succeeding years to persons entitled to his bounty." Whether property is transferred "in contemplation of death" is a question of fact. In United States v. Wells, 283 U.S. 102, it is recognized that the reference in the phrase "contemplation of death" is not to the general expectation of death which all entertain. "It must be a particular concern, giving rise to a definite motive." The court further stated: * * * It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. * * * The words "in contemplation of death" mean that the thought of death is the impelling cause of the transfer, and while *59 the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is "near at hand." If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. * * * The court further stated: "There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute." It is the contention of the respondent that the decedent was apprehensive of death from 1928 to the date of his death. He points to the fact that when the decedent was only approximately 25 years of age he had applied for life insurance and that the application had been rejected because of a heart murmur. It is undoubtedly true that the decedent was conscious all of his life of his heart condition. This knowledge *60 made him health conscious. He understood the limitations that he was laboring under. He was careful of his health. He had many check-ups by different doctors over a long period of years. The doctors always pronounced him in good physical condition. Most doctors never discovered any heart murmur. He suffered no serious illness for many years prior to 1936. He worked strenuously at his office, was keen and alert, and did not seem to suffer fatigue from staying up late at night. He was at about the peak of his physical condition in 1928. He had accumulated a fortune well in excess of a million dollars. He was of an extremely generous nature. In 1922 and 1924 he created five trusts for the benefit of friends and distant relatives. These gifts were not made in contemplation of death. The respondent does not contend that they were. The respondent has determined that the transfers of property made by the decedent after 1927 were made in contemplation of death. His determination is prima facie correct. The burden of proving that they were not made in contemplation of death rests upon the petitioners. Considering first the transfer of the shares of Wheeling & Lake Erie Ry. Co. stock by *61 the decedent on September 12, 1928, we are of the opinion that the evidence shows that this gift was not made in contemplation of death. In 1928 the decedent was of the age of 67 years. He was enjoying good health. He had not had any serious illness for many years. He was at the peak of his business career. He had made a large fortune accumulated from scratch. He was engaged in speculative transactions with Frank E. Taplin, a coal operator of Ohio. All of the evidence goes to show that the decedent made this gift to his wife, partly for the purpose of equalizing his fortune with his wife but primarily to place these shares of stock out of his ownership so that they would not be jeopardized by losses which he might sustain on speculative transactions. We hold that this gift was not made in contemplation of death. More serious consideration needs to be given to the transfer of property made to the Chase National Bank as trustee on the creation of the trust of February 9, 1931. The assets transferred consisted of the bulk of the decedent's fortune. The evidence is that he contemplated making this transfer of assets fully a year before the transfer was actually made. His son testified *62 that the decedent told him that he believed that the creation of this trust with the Chase National Bank would secure the goodwill of the bank in making loans to William Atwater & Co., Inc., of New York. He further testified that nothing was ever mentioned by his father relative to his death or relative to estate taxes which might be saved by making the transfer. So far as the son knew the father did not consider that angle at all. So far as appears the transfer was made only to improve the credit position of the decedent's enterprises with the Chase National Bank. We do not overlook the fact that the credit of decedent's enterprises with the bank would have been as effectively established by his deposit of the securities forming the corpus of the trust as collateral. Nor do we see how the trust assets could have been availed of by the bank for loans made to the corporation. It is possible, however, that the bank holding the assets as trustee would have been more liberal to the company when it was acting as trustee. The evidence is that this was the principal reason why the trust was established. In the absence of any proof that the idea of death possessed the mind of the decedent *63 we hold that the transfer of the assets to the bank as trustee was not made in contemplation of death. The situation appears to be much the same as that which obtained in Colorado National Bank of Denver v. Commissioner, 305 U.S. 23. In that case the decedent at the age of 80 created an irrevocable trust transferring to it property of a value of about $800,000 with the provision that the income therefrom should go to decedent's daughter for life and the remainder to her issue. The Board of Tax Appeals held in a Memorandum Opinion that the gift was not made in contemplation of death. Our decision in that case was reversed by the Circuit Court of Appeals, 95 Fed. (2d) 160, which decision was in turn reversed by the United States Supreme Court. In referring to its prior decision in the Wells case the Supreme Court stated: * * * We adhere to what was there said. The mere purpose to make provision for children after a donor's death is not enough conclusively to establish that action to that end was in "contemplation of death." Broadly speaking, thoughtful men habitually act with regard to ultimate death but something more *64 than this is required in order to show that a conveyance comes within the ambit of the statute. Unquestionably the decedent's health was not as good in 1936 as it was in 1928 and in 1929. It was on October 22, 1936, that the decedent deeded to his children his real estate on Long Island. By this time the decedent had acquired property in his wife's name in Florida. His interest in the Westhampton Beach property had diminished. His wife liked the Florida climate much better than the Long Island climate and she objected to spending even a part of her summer on Long Island. When the decedent found that he could no longer rely on the caretaker whom he had employed for many years, he wished to be rid of the care of the Westhampton property. It was for that reason that he decided to deed the property to his children. Even though the decedent was not enjoying robust health at the time we think the evidence shows that contemplation of death was not the reason for the transfer of the property. All of the evidence goes to show that the trust created by the decedent on November 27, 1936, for his daughter-in-law, Eleanor Bartlett Atwater, was not in contemplation of death. It was prompted by *65 the suggestion of decedent's daughter. She had requested her father to create this trust nearly a year before he did. The daughter thought that it would be good for the morale of Eleanor if she could have an independent income of her own. She had inherited no property from her parents. The decedent toyed with the proposition for some time. His daughter again made inquiry of her father at several different times relative to the creation of the trust which she had suggested. In the fall of 1936 he told her: "Keep your shirt on sister, I am not going to die." Shortly thereafter, on November 27, 1936, he created a small trust for the daughter-in-law's benefit. We hold that this trust was not created in contemplation of death within the meaning of the statute. One of the assignments of error by the petitioners in Docket No. 2616 is that if any of the transfers determined by the respondent to have been made by the decedent in contemplation of death were actually so made the estate of the decedent may be entitled to the deduction of accrued inheritance taxes arising from the decision of this Court. It is not clear whether petitioners are entitled to any credit. Upon proof of the payment *66 of State inheritance taxes the estate is entitled to the credit allowed by the statute. The only question presented in Docket No. 2617 is whether the Chase National Bank as trustee is liable for any deficiencies in estate tax. It is not liable for such deficiencies by reason of being a trustee of the assets of the trust created on February 9, 1931. The transfers to the Chase National Bank were not made in contemplation of death. Decision will be entered under Rule 50.